FARGO WOMEN'S HEALTH ORGANI-
ZATION; Susan Wicklund, M.D.;
George M. Miks, M.D.; Cynthia Palmer;
Craig Shoemaker, M.D.; and Jane Doe,
Plaintiffs–Appellants;

v.

Edward T. SCHAFER, as Governor of the
State of North Dakota; Heidi Heitkamp,
as Attorney General of the State of
North Dakota, Defendants–Appellees.

No. 93–1579.

United States Court of Appeals,
Eighth Circuit.

Submitted April 14, 1993.

Decided Feb. 10, 1994.

Counsel who presented argument on behalf of the appellant was Simon Heller of New York, NY.

Counsel who presented argument on behalf of the appellee was Sidney Hertz Fiergola of Bismarck, ND.

Before McMILLIAN, Circuit Judge, JOHN R. GIBSON [*], Senior Circuit Judge, and WOLLMAN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Fargo Women's Health Organization and individuals associated with it appeal from the district court's [1] entry of summary judgment in favor of the State of North Dakota upholding the constitutionality of the North Dakota Abortion Control Act, N.D.Cent.Code §§ 14–02.1–01 to 14–02.1–12, *amended by* 1991 N.D.Laws ch. 141 (effective April 1, 1991).

The Organization challenges two of the 1991 amendments [2] concerning informed consent: (1) the provision requiring abortion providers to give women seeking abortions certain information twenty-four hours before the abortion concerning assistance benefits that may be available, liability of the father, and the right to review printed material provided by the State; and (2) the definition of "medical emergency." [3] It also challenges two provisions of the preexisting Act—the definition of "abortion" [4] and the general penalty provision. We affirm the judgment of the district court.

After North Dakota amended its Abortion Control Act in 1991, the Organization brought this action asserting that the Act is unconstitutional on its face. The Organization sought a declaratory judgment that the provisions were unconstitutional and immediate injunctive relief prohibiting enforcement of the Act.

On August 23, 1991, the district court granted a preliminary injunction as to the informed consent and twenty-four hour waiting period requirements. The parties agreed to hold this case in abeyance pending the Supreme Court's decision in *Planned Parenthood v. Casey*, —— U.S. ——, 112 S.Ct.

---

[*] The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

1. The Honorable Rodney S. Webb, Chief Judge of the United States District Court for the District of North Dakota.

2. The amendments contain a four-part definition of "informed consent," requiring that at least twenty-four hours before the abortion, the physician who will perform the abortion, the referring physician, or physician's agent tell the woman seeking an abortion: (1) the name of the physician who will perform the abortion; (2) the particular medical risks associated with the abortion procedure; (3) the probable gestational age of the unborn child at the time of the abortion; and (4) the medical risks of carrying the pregnancy to term. N.D.Cent.Code § 14–02.1–02(5)a. The Act also requires that the physician or the physician's agent inform the woman at least twenty-four hours before the abortion that medical assistance benefits may be available for prenatal care, childbirth, and neonatal care; that the father is liable to assist in supporting the child, even if he offered to pay for the abortion; and that she has a right to review certain printed materials pub-

lished by the State describing the fetus and listing agencies that offer alternatives to abortion. N.D.Cent.Code § 14–02.1–02(5)b. The woman must certify in writing before the abortion that she has received the required information and has been informed of the opportunity to review the printed materials. N.D.Cent.Code § 14–02.1–02(5)c. The statute requires that the woman give an informed consent prior to the abortion, except in the case of a "medical emergency." N.D.Cent.Code § 14–02.1–03(1). The Act prescribes civil and criminal penalties for violations of the statute. N.D.Cent.Code § 14–02.1–11.

3. "Medical emergency" is defined as "that condition which, on the basis of the physician's best clinical judgment, so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a twenty-four hour delay will create grave peril of immediate and irreversible loss of major bodily function." N.D.Cent.Code § 14–02.1–02(7).

4. "Abortion" is defined as "the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead embryo or fetus." N.D.Cent.Code § 14–02.1–02(1).

2791, 120 L.Ed.2d 674 (1992), since the statutory provisions at issue in *Casey* were nearly identical to the provisions in this case. The district court accepted the parties' stipulations regarding the substantial overlap of this case and *Casey*, and required that the parties delay filing summary judgment motions until after release of the *Casey* decision. After the Supreme Court issued its opinion in *Casey*, the State moved for summary judgment. The district court granted summary judgment for the State, vacated the preliminary injunction, and ordered that the case be dismissed. *Fargo Women's Health Org. v. Sinner*, 819 F.Supp. 862, 865 (D.N.D.1993). The Organization then sought a stay pending appeal, which the district court denied. *Fargo Women's Health Org. v. Schafer*, 819 F.Supp. 865, 866 (D.N.D.1993). The next day Judge McMillian granted the Organization's motion for a temporary stay pending appeal. On March 30, 1993, a panel of this court vacated the stay and denied the injunction pending appeal.[5] The following day the Organization sought and obtained a stay pending appeal from Justice Blackmun who referred the case to the full Supreme Court for a decision on the stay application. *Fargo Women's Health Org. v. Schafer*, No. A–742 (Mar. 31, 1993). On April 2, 1993, the Supreme Court denied the stay pending appeal. *Fargo Women's Health Org. v. Schafer*, —— U.S. ——, 113 S.Ct. 1668, 123 L.Ed.2d 285 (1993). Justice O'Connor, joined by Justice Souter, wrote a separate concurrence, stating that she believed the lower courts should have conducted an inquiry as to whether the North Dakota provisions at issue constitute an undue burden for women seeking abortions. *Id.* at ——, 113 S.Ct. at 1669. We heard argument on the merits and thereafter granted a stay pending determination of this appeal.

The Organization argues on appeal that the Supreme Court's decision in *Casey*, ——

U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and its articulation of the "undue burden" standard require that the district court make factual findings, that a facial challenge may succeed even if the statute could be applied constitutionally to some women, and that the preliminary injunction should be reinstated pending trial on the merits. The State argues that the district court properly granted summary judgment and dismissed the Organization's facial challenge to North Dakota's law because it is similar to the Pennsylvania statute upheld in *Casey*, and that the district court correctly rejected the Organization's claim that the statute was void for vagueness.

We review an appeal from a decision granting summary judgment de novo. *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir.1992). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

Relying on *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), and *Rust v. Sullivan*, 500 U.S. 173, 182–84, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991), the district court held that a successful challenge to the facial validity of a statute requires a showing that no set of circumstances exists under which a statute would be constitutional. *Fargo Women's Health Org.*, 819 F.Supp. at 864. The court stated that merely demonstrating that the Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. *Id.* (citing *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100). The district court rejected the Organization's argument that the court should factually assess the degree of burden imposed by the Act under the *Casey* "undue burden" standard.[6] 819 F.Supp. at 865.

---

**5.** By inadvertence this opinion was not published. We attach it as an appendix to this opinion.

**6.** The *Casey* joint opinion defined an "undue burden" as follows:

A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an

abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be

When a panel of this court considered the Organization's appeal for a stay pending appeal, it agreed with the standard the district court employed in considering a facial challenge. *Fargo Women's Health Org. v. Schafer,* No. 93–1579, slip op. at 3–6, 1993 WL 603600 (8th Cir. March 30, 1993). Nevertheless, according to Justice O'Connor in her concurrence with the Supreme Court's denial of the Organization's motion for a stay pending appeal of this case, the facial challenge standard should include a factual inquiry in abortion regulation cases. *Fargo Women's Health Org.,* —— U.S. at ——, 113 S.Ct. at 1669. Justice O'Connor wrote: "In striking down the Pennsylvania law, we did not require [plaintiffs] to show that the provision would be invalid in *all* circumstances." *Id.* Justice O'Connor, joined by Justice Souter, emphasized that a law constitutes an "undue burden," and is therefore invalid, if "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* (quoting *Casey,* —— U.S. at ——, 112 S.Ct. at 2830). Thus, the first question we must decide is whether the district court, and this court in its opinion of March 30, 1993, denying the stay pending appeal, followed Supreme Court mandate in applying the *Salerno* facial challenge test.

The *Casey* decision and the comments of Justice O'Connor and Justice Souter concurring in the denial of stay entered April 2, 1993, cause us to question whether the undue burden test of *Casey* replaces the *Salerno* test. This is an issue that we believe only the Supreme Court can ultimately decide. In the present posture that we face, we believe we should first analyze the questions before us under the *Salerno* test, and then analyze the issues as if the undue burden test has replaced *Salerno.* We pause to explain the cause for our concern with the appropriate standard and our reasons for concluding that we must approach this case first as if *Salerno* applies and then as if it does not apply.

First, as we pointed out in our opinion of March 30, 1993, we find support from *Casey*

for our conclusion that the *Salerno* standard remains the law. The *Casey* joint opinion authors—Justices O'Connor, Souter, and Kennedy—carefully reviewed and selectively departed from other earlier precedent, but did not specifically reject *Salerno.* See —— U.S. at ——, 112 S.Ct. at 2823 (overruling parts of *Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I*), and *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986)); *id.* —— U.S. at ——, 112 S.Ct. at 2830–31 (holding that *Bradwell v. Illinois,* 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1872), and *Hoyt v. Florida,* 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), expressed views inconsistent with today's understanding of family, individuals, and the Constitution). If the three justices wanted to depart from the *Salerno* standard, we believe they would have specifically stated that the standard did not apply. Chief Justice Rehnquist stated in his dissent that "because this is a facial challenge to the [Pennsylvania] Act, it is insufficient for petitioners to show that the [spousal] notification provision 'might operate unconstitutionally under some conceivable set of circumstances.'" *Casey,* —— U.S. at ——, 112 S.Ct. at 2870 (Rehnquist, C.J., dissenting in part) (quoting *Salerno,* 481 U.S. at 745, 107 S.Ct. at 2100). In light of this strong statement and the absence of response to it in the three-justice opinion, the continuing vitality of *Salerno* is at least an open question.

Moreover, Justice Souter joined Justice O'Connor in her April 2, 1993, concurrence, but Justice Kennedy, who had joined in the three-justice opinion in *Casey,* did not. Further, Justice White, who joined in Justice Rehnquist's dissent in *Casey,* has retired, and the Supreme Court has not considered this issue since Justice Ginsburg assumed office. We do not see our role as attempting to divine the Court's present or future posture on this issue. It is enough that we simply wait further rulings of the Supreme Court to instruct us on the viability of the

considered a permissible means of serving its legitimate ends.

—— U.S. at ——, 112 S.Ct. at 2820.

*Salerno* rule.[7] Thus, we first analyze the issues before us under the *Salerno* test.

### I.

■ We recognize that *Salerno* requires the Organization to overcome the difficult challenge of proving that no set of circumstances exists under which the law could be constitutionally valid. *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100. Because the Organization failed to do so, summary judgment for the State was proper. The Organization argued that the North Dakota law was different from the Pennsylvania law in *Casey* and therefore that *Casey* did not govern. We agree with the district court's conclusion that the laws are substantially similar, and that the Organization's facial challenge must fail due to the Supreme Court's acceptance of nearly identical provisions in *Casey*. *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 523, 109 S.Ct. 3040, 3059, 106 L.Ed.2d 410 (1989), (O'Connor J., concurring); *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514, 110 S.Ct. 2972, 2980, 111 L.Ed.2d 405 (1990) (*Akron II*); *Barnes v. Moore*, 970 F.2d 12 (5th Cir.) (rejecting undue burden standard in facial challenge), *cert. denied*, —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992); *Barnes v. Mississippi*, 992 F.2d 1335 (5th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 468, 126 L.Ed.2d 419 (1993).

### II.

■ We now consider the propriety of the district court order, assuming that the undue burden test enunciated in *Casey*, rather than the *Salerno* test applies. Justice O'Connor's concurring opinion to the denial of stay framed the issue as whether the law restricting abortion "constitutes an undue burden, and hence is invalid, if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" —— U.S. ——, at ——, 113 S.Ct. 1668, at 1669, 123 L.Ed.2d 285 (citing *Casey*, —— U.S. at

——, 112 S.Ct. at 2830). Justice O'Connor then referred to the examination developed in the district court in determining whether the informed consent provision created an undue burden, and suggested that the lower courts in this case should have undertaken a fact-intensive analysis. *Id.*

The district court made no factual findings in this case. We do have, however, a considerable factual record presented to the district court by the Organization in support of its claim that the five provisions of the Act are facially invalid. In analyzing a summary judgment ruling, we assume as true all of the facts in the affidavits or deposition testimony submitted by the non-moving party, the Organization. We first determine whether there is a factual issue that requires determination by a finder of fact, or second, whether the factual record as presented is sufficient to sustain the Organization's burden to demonstrate facial invalidity.

### A.

As we begin this analysis, we first interpret the statute before us, because many of the Organization's arguments are based on the premise that the North Dakota law constitutes an undue burden because the Act necessitates that a woman make two visits, or for some minors, three trips, to medical facility to obtain an abortion. Before argument in this case, North Dakota's Office of Attorney General issued an opinion to a county state's attorney interpreting the informed consent provision of the statute. The Supreme Court of North Dakota has held that an Attorney General's opinion has the force and effect of law until a contrary ruling by a court. *Johnson v. Baker*, 74 N.D. 244, 21 N.W.2d 355, 364 (1945). That court has further held that opinions of an Attorney General are "entitled to respect," and a court should follow them if "they are persuasive." *Svanes v. Grenz*, 492 N.W.2d 576, 579 (N.D. 1992). The Attorney General's interpretation of the statute is highly persuasive to us,

---

7. We also observe that the Supreme Court has denied certiorari in *Barnes v. Moore*, 970 F.2d 12 (5th Cir.1992), which applied the *Salerno* test.

*See* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992). *Cf. Casey v. Planned Parenthood*, 14 F.3d 848, 863 n. 21 (3d Cir.1994).

and is consistent with our independent analysis of the statute.

Principles of statutory construction contained in North Dakota statutes, sections 1–02–02, 1–02–03, and 1–02–05, provide that when the language of a statute is unambiguous, words must be given their plain, ordinary and commonly understood meaning, and must be construed according to the rules of grammar. *See Kim–Go v. J.P. Furlong Enters. Inc.*, 460 N.W.2d 694, 696 (N.D.1990). Various sections of the North Dakota statute require that certain information be given to a woman seeking an abortion twenty-four hours before the abortion. Specifically, the physician who is to perform the abortion, a referring physician, or the physician's agent must tell the woman the name of the physician who will perform the procedure, the medical risks, probable gestational age of the fetus, and the medical risks of pregnancy. N.D.Cent.Code § 14–02.1–02(5)a. The clear language of the statute authorizes the physician's agent to give this information with one exception: the attending physician must determine the probable gestational age of the fetus at the time the procedure will be performed because this determination involves a medical judgment. However, the physician may delegate certain tasks to an agent, such as obtaining information from the patient, particularly the key fact of the woman's last menstrual period. The statute allows the agent to inform the woman of the probable gestational age of the fetus following the physician's determination.

Further, the statute requires that the physician or physician's agent inform the woman about the possibility of medical assistance benefits and child support, and that she has the right to review materials prepared by the State of North Dakota which describe the gestational development of the fetus and list agencies that offer alternatives to abortion. N.D.Cent.Code § 14–02.1–02(5)b. With respect to all of the information the physician or the physician's agent must provide a woman, there is nothing in the statute that requires that she receive this information during a personal visit. We find no language in the statute that prevents a physician or agent from giving this information over the telephone. The statute only provides a woman must be "told" or "informed." In today's society, these words do not necessarily connote a face-to-face verbal exchange. In the March 1993 opinion letter, the Attorney General of North Dakota clearly expresses the opinion that this information can be given by telephone, reasoning that the unambiguous words of the statute and their plain, ordinary and commonly understood meaning so permit. Our own interpretation of these sections of the statute is the same as that expressed by the Attorney General.

Considering the Attorney General's opinion letter, the only question that remains concerns the information on gestational age. Here, the Attorney General opines that the gestational age can be determined by information obtained from the woman, namely, the date of the last menstrual period or conception; that the physician may delegate the task of obtaining this information to an agent as long as the physician ultimately uses his or her medical judgment to determine gestational age; and that the physician's agent may then give the information to the patient. Again, our reading of the statute based on the unambiguous words in their plain, ordinary and commonly understood meaning is the same as that expressed by the Attorney General in the March 1993 opinion letter.

Finally, the statute requires that a woman certify that the required information has been furnished to her, and that she has been given the opportunity to review certain printed information. N.D.Cent.Code § 14–02.1–02(5)c. The physician or physician's agent must receive a copy of the woman's certification. N.D.Cent.Code § 14–02.1–02(5)d. The statute does not require that this certification be given before the woman appears at the clinic for the abortion procedure. This is the one occasion described in the statute when the woman must appear and give the required certification, and yet nothing requires that she give it at any time until immediately before the medical procedure. Again, the Attorney General's opinion is the same as the interpretation that we reach by our study of this provision of the statute.

### B.

We recognize that special provisions apply to a woman under the age of eighteen. N.D.Cent.Code § 14–02.1–03.1.1. These sections are not an issue in this case. The statute provides, however, that twenty-four hours before an unemancipated minor gives her consent, the attending physician must provide to her parents, in person, the information we have referred to above unless forty-eight hours before the minor's consent, the physician certifies that he or she has caused that information to be sent by certified mail to each of the parents. N.D.Cent. Code § 14–02.1–03. This notification procedure does not apply if the minor elects to proceed with the juvenile court authorization process, if the attending physician obtains the written consent of the minor and her parents, or, if she is married, the attending physician obtains her consent. N.D.Cent. Code § 14–02.1–03.1.1. It is particularly enlightening that the statute only mandates a person-to-person meeting in the parental notification requirement described above, and even then no personal visit is required if the information is mailed forty-eight hours before the minor's consent.

With the exception of the provisions relating to minors, we believe the statute authorizes the physician or physician's agent to give the required information by telephone twenty-four hours in advance, with a face-to-face appearance only required for the woman to certify that she has been given the required information and execute the consent for the procedure. It is significant that most, if not all, of the Organization's arguments are based on the assumption that the woman must appear at the clinic or other medical facility twenty-four hours before a second appearance, at which time the procedure will be performed. We believe the statutes simply do not require two visits as the Organization asserts.

Our conclusion today that the statute does not constitute an undue burden is premised on our interpretation that the statute mandates only one personal visit to the clinic. We recognize that the parties are free to challenge the statute in the future. Should the Attorney General or courts ultimately interpret the statute as requiring more than one in-person visit to the medical facility before a woman may obtain an abortion, the facial validity analysis will be entirely different. *See Casey,* 947 F.2d at 701 (finding medical emergency provision would be unconstitutional if the State changes application of the Act); *Casey,* 14 F.3d at 862 (requiring parties to await implementation of the Act before asserting a future challenge). Perhaps the issue will not arise, and if it does, it may be faced at some future date.

With the interpretation set out above, we now turn to whether the North Dakota statute creates an undue burden on a woman seeking an abortion. Three justices in *Casey* defined undue burden as "shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion." —— U.S. at ——, 112 S.Ct. at 2820. The means chosen by the State to regulate abortions must be "calculated to inform the woman's free choice, not hinder it." *Id.*

With respect to the informed consent requirements of the statute, we observe the close similarity between the North Dakota statute and the Pennsylvania statute at issue in *Casey.* The requirements that a woman certify that she has been informed of the availability of printed materials describing the fetus, information about medical assistance for childbirth, information about child support from the father, and has received a list of agencies providing adoption and other services as alternatives to abortion are quite similar, if not identical, in the Pennsylvania statute and the North Dakota statute. *Casey* approved the requirement that a woman give written informed consent and approved the furnishing of information to the woman, including materials relating to the consequences to the fetus, the availability of information relating to fetal development, and the assistance available should she decide to carry the pregnancy to full term. —— U.S. at ——, 112 S.Ct. at 2823. *Casey* held these were reasonable measures to insure an informed choice and did not amount to a substantial obstacle, or an undue burden, to

obtain an abortion. *Id.* at ——, 112 S.Ct. at 2824. According to *Casey*, compliance with the informed consent provisions is not required if the physician demonstrates by a preponderance of the evidence that he or she reasonably believed that furnishing the information would have resulted in a severely adverse effect on the physical and mental health of the patient. —— U.S. at ——, 112 S.Ct. at 2825. The North Dakota statute has a similar medical emergency exception. *See* N.D.Cent.Code § 14–02.1–03. The Supreme Court held the medical emergency provisions of the Pennsylvania statute did not constitute an undue burden. *Id.* at ——, 112 S.Ct. at 2822. The Court reached this conclusion relying on the construction of the statute by the court of appeals. *Casey* reaffirms our conclusion that these particular provisions of the statute are not an undue burden for women in North Dakota.

*Casey* also found the twenty-four hour waiting period was not an undue burden, reasoning that "important decisions will be more informed and deliberate" if made after some period of reflection. —— U.S. at ——, 112 S.Ct. at 2825. Again, the Court looked to the exception for medical emergencies and record evidence that in the vast majority of cases a twenty-four hour delay does not create an appreciable health risk. *Id.* Recognizing that in practice there is a substantial obstacle in a mandatory twenty-four hour waiting period, the Court found a closer question was whether the waiting period will increase the exposure of women seeking abortions to harassment and hostility of anti-abortion protesters. *Id.* *Casey* held that these findings, while troublesome, did not demonstrate that the waiting period constituted an undue burden. *Id.*

The arguments asserted by the Organization, to a great extent, concentrate on the twenty-four hour delay and the fact that such delay requires two trips to the clinic, exposing the woman to dual harassment, stalking, and contact at home in the intervening period. Our interpretation of the provisions in the North Dakota statute as we discussed above completely answers this argument. The statute does not require two trips to the medical facility.

Similarly, the statements in the affidavits provided by the Organization dealing with the distances its patients must travel, and the costs of extended stays in the city, are also answered by the determination that the first contact can be made by telephone. Indeed, we expect that before appearing at the clinic a woman would call for an appointment to ensure that a doctor was available. The required information can be given during this first, or any subsequent telephone contact. Allowing information to be given by telephone and the necessity of only one physical appearance at the medical facility does not change the ordinary procedure that would otherwise exist absent any statutory requirements. We have no hesitation in concluding that under these circumstances there is no state regulation that has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion. Although the distance a woman must travel to obtain an abortion may be a factor in obtaining an abortion, it is not a result of the state regulation. We do not believe a telephone call and a single trip, whatever the distance to the medical facility, create an undue burden. Further, although the physicians who work at the Fargo Women's Health Organization clinic only schedule abortions on Thursdays and Fridays, this would not cause additional delay or burden because the clinic could make the telephone contact on any day and then schedule the single personal visit on Thursday or Friday. Again, this scheduling limitation is a result of the limited number of days the physicians are present, not the state regulation.

The Organization also attacks the statutory requirement that a woman be informed that medical assistance benefits may be available, and that the father is liable for child support. The Organization has provided affidavits alleging the adverse nature of this information, its possible falsity, and the detrimental impact on women seeking abortions. As we read the statements contained in the affidavits dealing with these provisions, they express opinions and conclusions, but give only limited support to the Organization's arguments. The provision discussing medical assistance provides that the required ben-

efits "may be available," not that they *are* available. N.D.Cent.Code § 14–02.1–02.-5b(1). The statement that the father is liable to assist in supporting the child finds its support in other North Dakota statutes. *See* N.D.Cent.Code § 14–09–08 (providing that parents have a mutual duty to support their children). If in certain cases such a statement would be misleading or false, it would undoubtedly be because of unique and personal background facts that would be at least suspected if not known to the woman.

Following these two provisions, the statute contains a subparagraph relating to the availability of printed materials. Here, the statute is clear that the physician and agent may disassociate themselves from the materials and may, or may not, comment on them as they choose. If the physician or agent can comment on the printed materials, we do not interpret the statute to be so restrictive that they cannot comment on the medical assistance and father's liability provisions.

### III.

The Organization argues that the definitions of medical emergency and abortion are both void for vagueness. It asserts that this issue was not decided in *Casey*, and remains an open legal issue.

### A.

█ With respect to the Pennsylvania medical emergency definition at issue in *Casey*, the Third Circuit rejected arguments that the definition was void for vagueness because the statute allowed doctors to forego the Act's requirement on the basis of the physician's good faith clinical judgment. *Casey*, 947 F.2d at 702. Although the Supreme Court granted certiorari with respect to the definition of medical emergency, —— U.S. ——, 112 S.Ct. 931, 117 L.Ed.2d 104 (1992), the only arguments advanced in the Supreme Court dealt with the claim of undue burden. —— U.S. at ——, 112 S.Ct. at 2822.

Like the Pennsylvania Act found constitutional in *Casey*, which allows the physician to rely on his or her "good faith clinical judgment," the North Dakota Act allows the physician to rely on his or her "best clinical judgment" in determining whether a condition constitutes a medical emergency. *See* N.D.Cent.Code § 14–02.1–02(7); 18 Pa.Cons. Stat. § 3203. Further, the North Dakota provision eliminates the waiting period requirement if there is "grave peril of immediate and irreversible loss of major bodily function." N.D.Cent.Code § 14–02.1–02(7). This language is virtually identical to a "serious risk of substantial and irreversible impairment of a major bodily function" found constitutional in *Casey*. *See* —— U.S. at ——, 112 S.Ct. at 2822.

The Organization argues that the Act must be written to be sufficiently precise, and must define the criminal offense with sufficient clarity so that ordinary people understand what conduct is prohibited. It argues that the terms of the statute, "major bodily function," "immediate" and "grave," are ambiguous, and that physicians will be chilled from performing abortions in legitimate medical emergencies. We reject these arguments. As the Third Circuit reasoned in *Casey*, the reference to doctor's clinical judgment saves the statute from vagueness. 947 F.2d at 702. While the statute in *Casey* refers to "clinical judgment" in terms of "good faith" rather than "best" as in North Dakota, it is the exercise of clinical judgment that saves the statute from vagueness, and the difference in the adjectives is not material to our analysis. *See United States v. Vuitch*, 402 U.S. 62, 71–72, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (1971) (rejecting void-for-vagueness attack); *Doe v. Bolton*, 410 U.S. 179, 191–92, 93 S.Ct. 739, 747, 35 L.Ed.2d 201 (1973) (same).

In addition, the North Dakota Act contains a scienter requirement that we believe prevents a finding of vagueness. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) ("a scienter requirement may mitigate a law's vagueness"). In fixing general penalties, section 14–02.1–11 does not specify a culpability standard with respect to a violation of the Act. The North Dakota statute provides that if a statute defining a crime does not specify culpability and does not provide explicitly that a person may be found guilty without culpabili-

ty, the culpability that is required is "willfully." N.D.Stat.Cent.Code § 12.1–02–02.2. Willfully is then defined to mean conduct done "intentionally, knowingly or recklessly," and these terms are defined with specificity. *See* N.D.Stat.Cent.Code § 12.1–02.02.1.(a)–(e). This strict scienter requirement, which adequately notifies physicians that certain conduct is prohibited, is an additional basis for saving the statute from the Organization's vagueness challenge. *Cf. Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979) (statute without scienter requirement held void for vagueness).

Further, we believe the medical emergency definition is not vague when viewed in light of the purpose section of the Act, which states that "[t]he purpose of this chapter is to protect unborn human life and maternal health within present constitutional limits ... [and] reaffirms the tradition of the state of North Dakota to protect every human life whether unborn or aged, healthy or sick." N.D.Cent.Code § 14–02.1–01. Certainly this section supports our interpretation of the medical emergency statute that compliance with the abortion regulations would not in any way pose a significant threat to the life or health of the woman, and the reference to the physician's best clinical judgment certainly places in the physician's hands the medical judgment that would satisfy the requirements of the statute. *See Akron II,* 497 U.S. at 514, 110 S.Ct. at 2980 (statute is not unconstitutionally vague merely because of hypothetical situations that may never occur). We reject the Organization's void-for-vagueness challenge, observing that the Organization does not urge us to consider whether the definition creates an undue burden.

### B.

██ The Organization also challenges as void for vagueness North Dakota's definition of abortion, which has been defined for over twenty years as the "termination of human pregnancy with an intention other than to produce a live birth or remove a dead embryo or fetus." N.D.Cent.Code § 14–02.1–02(1). The Organization argues that this def-

inition would subject certain medical procedures such as amniocentesis to the informed consent provisions because the procedures, although not performed with intent "to produce a live birth or to remove a dead fetus," could result in termination of the pregnancy as a consequence. The argument is unduly strained. A common sense interpretation of the statute easily leads us to believe that physicians are fully capable of understanding the Act's requirements and prohibitions. Further, as we have discussed above, section 12.1–02–02(2) imposes criminal penalties only if the physician "willfully" terminates a pregnancy without obtaining the necessary informed consent. This scienter requirement defeats the Organization's argument as to the vagueness of this provision.

Finally, this definition of abortion is substantially similar to the definition the Supreme Court found constitutional in *Casey.* *See* 18 Pa.Cons.Stat.Ann. § 3203 ("abortion" defined as "[t]he use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination will ... cause the death of the unborn child."). *See also Charles v. Carey,* 627 F.2d 772, 787 (7th Cir.1980) (rejecting a void-for-vagueness challenge to an Illinois statute's definition of abortion).

\*　　\*　　\*

The Organization argues that the case should be remanded to the district court for development of a factual record. However, the Organization presented a factual record of substantial dimension in support of its motion for summary judgment. While much of the content of the affidavits is conclusory, we have assumed as true the factual statements in this record. We cannot help but observe substantial similarity between much of the material in the affidavits the Organization filed and the record developed in *Casey.* The Organization made filings in opposition to the motion over a three-month period. We believe the case can and should be decided on the record before us, and that needless delay would result if we remanded the case

to the district court for further proceedings and for its findings on undue burden.[8]

Because we affirm the summary judgment for the State, we need not discuss the Organization's request for an injunction pending a trial on the merits.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. I believe the district court erred in applying the *Salerno* facial challenge test. I would hold that the proper standard for determining the constitutionality of the North Dakota statutory provisions is the undue burden standard set forth in Justice O'Connor's plurality decision in *Casey*, —— U.S. at ——, 112 S.Ct. at 2830, and reiterated by Justice O'Connor in her April 2, 1993, concurrence with the Supreme Court's denial in the present case of the Organization's motion for a stay pending appeal. *Fargo Women's Health Org.,* —— U.S. at ——, 113 S.Ct. at 1669 ("[A] law restricting abortions constitutes an undue burden, and hence is invalid, if, 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.' ").[1] *Accord Casey v. Planned Parenthood,* 14 F.3d 848, at 863 n. 21 (3d Cir.1994) (opinion on remand) (Supreme Court's decision in *Casey* set a new standard for facial challenges to pre-viability abortion laws; *Casey* replaced "old rule" of *Salerno* with new rule requiring the plaintiff to show abortion regulation would be an undue burden in a large fraction of cases). Accordingly, I would remand this case to the district court with instructions that the district court hold an evidentiary hearing and make factual findings as to

whether the North Dakota provisions in question create such an undue burden. *See Fargo Women's Health Org.,* —— U.S. at ——, 113 S.Ct. at 1669 (O'Connor, J., concurring) (lower courts should have undertaken undue burden analysis as to the particular provisions at issue in this case). I would also grant the Organization's request for an injunction pending the district court's ruling on the merits.

### APPENDIX

Submitted: March 16, 1993

Filed: March 30, 1993

Before McMILLIAN, JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The Fargo Women's Health Organization and individuals associated with it seek this emergency temporary stay and injunction pending their appeal of the district court's order granting summary judgment against them and dismissing their claim. The Organization brought this action challenging the facial validity of the North Dakota Abortion Control Act, N.D.Cent.Code § 14–02.1, *amended by* 1991 N.D.Laws ch. 141 (effective April 1, 1991). The Organization specifically challenges the Act's informed consent requirements and its definitions of "medical emergency" and "abortion." The district court concluded that *Planned Parenthood v.*

---

**8.** After our opinion was transmitted to the court's clerk for filing, we received a filing from counsel pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure citing Justice Souter's in-chambers opinion denying stay of the mandate of the Third Circuit in *Casey v. Planned Parenthood,* 14 F.3d 848 (3d Cir.1994). *See Planned Parenthood v. Casey,* —— U.S. ——, 114 S.Ct. 909, 127 L.Ed.2d 352 (1994). We have carefully considered Justice Souter's opinion and see nothing that requires modification of our opinion.

We are aware that Justice Souter recognized that the Supreme Court applied the undue burden standard to the record before it in *Casey. See Casey,* —— U.S. at ——, 114 S.Ct. at 911, 127

L.Ed.2d 352 (1994). While our analysis was conducted on affidavits submitted in response to a motion for summary judgment, assuming the facts as stated to be true, we believe the parties did have the "fair opportunity" and "broad latitude" to develop the issues. *See id.* at ——, 114 S.Ct. at 911.

We have applied the undue burden standard to the factual record made in the district court as the Supreme Court did in *Casey.*

**1.** I attach no significance to the fact that Justice Kennedy did not join Justice O'Connor's April 2, 1993, concurrence because the circumstances under which he did not participate in that ruling are unknown.

*Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), required it to hold that the statute was facially constitutional. The court then vacated its order suspending enforcement of the Act and denied the Organization's motion for stay and injunction pending appeal. The Organization then filed the motion now before us. Immediately following the argument, we extended Judge McMillian's temporary stay until such time as a reasoned opinion could be filed. We have expedited this appeal, and now vacate the temporary stay.

After North Dakota amended its Abortion Control Act in 1991, the Organization brought this action challenging two provisions of the Act carried over from the preexisting code, specifically the definition of "abortion" and the general penalty provision.[1] *See* N.D.Cent.Code §§ 14–02.1–02.1, 14–02.1–11. The Organization also challenges subsections in the 1991 amendments defining "medical emergency" and requiring a physician, except in medical emergencies, to obtain "informed consent" before performing an abortion.[2] *See* §§ 14–02.1–02(7), 14–02.1–03(1).

The parties agreed that the case should be held in abeyance until the *Casey* opinion was

filed because of the similarity between the Act and the Pennsylvania statute under examination in *Casey.* The district court granted a preliminary injunction on August 23, 1991 with respect to the twenty-four hour waiting period and informed consent provisions. After *Casey* was decided, the court considered further briefing and argument and, on February 19, 1993, vacated the injunction and granted the State's motion for summary judgment dismissing the complaint. *See Fargo Women's Health Org. v. Sinner,* 819 F.Supp. 862 (D.N.D.1993).

The district court held, relying on *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), and *Rust v. Sullivan,* 500 U.S. 173, 182–84, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991), that a successful facial challenge requires a showing that no set of circumstances exists under which a statute would be constitutionally valid. 819 F.Supp. at 864–65. Merely demonstrating that the Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. *Id.* The court thus rejected the Organization's challenge, holding that provisions nearly identical to the Act's were held facially constitutional in *Casey.*[3] *Id.* The

---

1. The Organization raises no challenge to the two-parent consent provision which the preexisting Code contained.

2. The definition of informed consent requires that at least twenty-four hours before the abortion, the physician, the referring physician, or the physician's agent tell the woman the name of the physician who will perform the abortion, the particular medical risks associated with the abortion procedure, the "probable gestational age of the unborn child" at the time of the abortion, and the medical risks of carrying the child to term. § 14–02.1–02(5)(a). Further, the physician or the physician's agent must inform the woman twenty-four hours before the abortion that medical assistance benefits may be available for childbirth and prenatal and neonatal care; that the father is liable to assist in support of the child even when he offers to pay for the abortion; and that she has the right to review certain printed materials describing the fetus and listing agencies that offer alternatives to abortion. § 14–02.1–02(5)(b). The woman must certify in writing before the abortion that she has received

the required information and been informed of the opportunity to review the printed materials. § 14–02.1–02(5)(c).

The requirement of consent to perform the abortion is contained in section 14–02.1–03, which provides that no physician shall perform an abortion unless the physician certifies in writing that the woman gave informed consent as defined in section 14–02.1–02. None of the requirements of this subsection apply in case of medical emergency. § 14–02.1–03(1).

The definition of medical emergency is: "that condition which, on the basis of the physician's best clinical judgment, so complicates a pregnancy as to necessitate an immediate abortion to avert the death of the mother or for which a twenty-four hour delay will create grave peril of immediate and irreversible loss of major bodily function." § 14–02.1–02(7).

3. The district court found even more similar the Mississippi statutes which had been held constitutional in *Barnes v. Moore,* 970 F.2d 12 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 582 (1992).

district court rejected the Organization's argument that it should factually assess the degree of burden imposed by the Act under the new "undue burden" test adopted in *Casey*. *Id.* 819 F.Supp. at 85. It stated that the Organization should save this issue for "an as-applied challenge to the Act's constitutionality." *Id.* at 865. The district court then denied the Organization's motion for stay pending appeal, and the Organization filed this emergency motion for stay and injunction.

The Supreme Court discussed the requirements for a stay pending appeal in *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987), and we outlined those same requirements in *James River Flood Control Assoc. v. Watt*, 680 F.2d 543, 544 (1982):

> The party seeking a stay pending appeal must show (1) that it is likely to succeed on the merits; (2) that it will suffer irreparable injury unless the stay is granted; (3) that no substantial harm will come to other interested parties; and (4) that the stay will do no harm to the public interest.

We thus must evaluate the Organization's showings of these four factors. We first recognize that an analysis of likelihood of success on the merits involves the threshold consideration of simply that issue without making a final determination on the merits of the appeal. The problem before us is not unlike that in ruling on an order granting or denying a preliminary injunction. Nevertheless, this standard compels us to embark upon such an exercise, considering the other three factors and balancing all of them, just as the district court did in its order. We are convinced that the district court did not err in denying the stay on the basis that the Organization had failed to sustain its burden, particularly in light of *Casey*.

The Organization first argues that the district court erred in analyzing the likelihood of success without making a factual assessment of the degree of burden imposed by the Act on the right to choose abortion. The sub-

stance of this argument is that *Casey*, in announcing the undue burden standard, had employed a factual analysis. The *Casey* opinion, authored by Justices O'Connor, Kennedy, and Souter, reaffirmed the validity of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and adopted the undue burden standard for reconciling the state's interest with the woman's constitutionally-protected liberty. ⸺ U.S. at ⸺, 112 S.Ct. at 2821. Under that standard, it rejected facial challenges to Pennsylvania's definition of medical emergency, the informed consent requirement, the requirement that women seeking an abortion be informed of the availability of certain materials (including information on fetal development and assistance available to the woman should she decide to carry the pregnancy to full term), and a twenty-four hour waiting period following receipt of the required information. *Id.* at ⸺ ⸺ ⸺, 112 S.Ct. at 2822–26. The Supreme Court found unconstitutional, however, the requirement that the woman notify her spouse that she was about to have an abortion. *Id.* at ⸺, 112 S.Ct. at 2831.

The three-justice opinion in *Casey* did not articulate the standard it applied in analyzing the facial challenge. The three justices went to extreme care to articulate their analysis of *Roe* and abandon its trimester framework. *See id.* ⸺ U.S. at ⸺, 112 S.Ct. at 2818. They specifically overruled portions of *Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), and *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), as inconsistent with *Roe*. *See Casey*, ⸺ U.S. at ⸺, 112 S.Ct. at 2823. They held that *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1872), and *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961), expressed views no longer consistent with our understanding of the family, the individual, or the Constitution. *See id.* ⸺ U.S. at ⸺ ⸺ ⸺, 112 S.Ct. at 2830–31. Certainly after this careful review of, and selective departure from, earlier authority, had the

three justices desired to depart from the facial challenge standard in *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), as reiterated only a year ago in *Rust v. Sullivan,* 500 U.S. 173, 182–84, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991), we have no doubt that they would have done so explicitly. We draw support for this conclusion from the lack of reaction to Chief Justice Rehnquist's dissent. The Chief Justice wrote that "because this is a facial challenge to the [Pennsylvania] Act, it is insufficient for petitioners to show that the [spousal] notification provision 'might operate unconstitutionally under some conceivable set of circumstances.'" —— U.S. at ——, 112 S.Ct. at 2870 (Rehnquist, C.J., dissenting in part) (quoting *Salerno,* 481 U.S. at 745, 107 S.Ct. at 2100). He then added a lengthy footnote asserting that Justices O'Connor, Kennedy, and Souter had ignored this point in their analysis. In view of the Chief Justice's strong position, we believe that had the three justices been departing from the *Salerno* standard, they would have made a specific statement to that effect.

After *Casey,* Justice Scalia, joined by the Chief Justice and Justice White, dissented from the denial of a petition for writ of certiorari in *Ada v. Guam Soc. of Obstetricians & Gynecologists,* —— U.S. ——, ——, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992), stating that the Court in *Casey* had not purported to change the well-established *Salerno* rule.

The Organization's brief recognizes how critical this factual assessment is to its facial challenge. We simply do not read *Casey* as sustaining the argument that a factual assessment is necessary or permitted in such circumstances. We agree with the Fifth Circuit's conclusion in *Barnes v. Moore,* 970 F.2d at 14 n. 2, that it could not interpret *Casey* as having overruled *sub silentio* longstanding Supreme Court precedent governing facial challenges. *Id.*

Accordingly, we conclude that in adopting the undue burden standard in *Casey,* the three-justice opinion did not depart from the *Salerno* standard, and the district court did not err in so holding.

When we turn to the discussion in *Casey* of the specific statutory provisions, we see that the three justices examined the spousal notification provision first by considering in detail the factfindings of the district court, and then by referring to scholarly journals and texts. *Casey,* —— U.S. at —— – ——, 112 S.Ct. at 2826–28. The three Justices made clear that the studies and findings had confirmed their common sense conclusions. *Id.* at ——, 112 S.Ct. at 2828. Certainly *Barnes* comments that, in this respect, *Casey* "may have employed a somewhat different standard" but it did not interpret *Casey* as having overruled *Salerno.* *See Barnes,* 970 F.2d at 14 n. 2. *Casey*'s discussion of the other sections of the statute reveals an analysis relying, for the most part, on direct statutory interpretation, on statutory interpretation in the court of appeals, and on earlier Supreme Court authority. *See, e.g.,* —— U.S. at ——, 112 S.Ct. at 2822. On several occasions, particularly with relation to the twenty-four hour waiting period, the justices did consider practical consequences flowing from certain factual findings, but we do not read these discussions as essentially factual analyses. *Id.* at ——, 112 S.Ct. at 2824. The factual components of the analysis simply follow the earlier discussion and the initial conclusion regarding the undue burden standard. *Id.* at —— – ——, 112 S.Ct. at 2822–26.

Our reading of *Casey* is not only material to our conclusions with respect to the facial challenge standards, but also demonstrates that the district court correctly held that the provisions of the Act are substantially similar to those examined in *Casey,* and that *Casey* thus mandated a finding of no undue burden. In analyzing the mandatory twenty-four hour waiting period, the district court had before it an affidavit describing the distances women must travel to reach the Organization's clinic, asserting that the waiting period would often necessitate two visits to the clinic and a delay of more than twenty-four hours, and

stating that this would increase the exposure of women seeking abortions to the harassment of anti-abortion protesters demonstrating outside the clinic. The affidavit contains facts almost identical to those before the district court in *Casey*, 744 F.Supp. at 1351, 1352. Assuming the affidavit statements here are true, they still do no more than establish a factual pattern held not to be an undue burden in *Casey*. We conclude that the district court, examining these facts in light of *Casey*, did not err in determining that the Organization had not demonstrated the likelihood of success on the merits.

*Casey* delineates a careful balance between the constitutional rights of the women seeking abortions, and those of the State seeking to regulate the performance of abortions. The district court recognized North Dakota's interest in enforcing its statutes, and found that the plaintiffs had not demonstrated that they would be irreparably injured absent a stay. *Fargo Women's Health Org. v. Schafer*, 819 F.Supp. 865, 866 (D.N.D.1993). The district court did not err in so ruling. The Organization has not met its burden as required in *Hilton* and *Watt*. In balancing all of the relevant factors, we conclude that the stay pending appeal should be denied.

The Organization urges us to remand for further proceedings, as the Supreme Court did in *Casey*. The remand in *Casey*, however, was substantially limited to consideration of the question of severability, which had been specifically treated in the district court's opinion. *See Casey*, —— U.S. at ——, 112 S.Ct. at 2833; *see also Planned Parenthood v. Casey*, 978 F.2d 74 (3d Cir.1992) (on remand). No similar issues are presented in this case.

At argument, the State informed us that the Attorney General's Office was preparing an opinion interpreting the Act. It would read the Act to authorize that the required information which must precede the informed consent by twenty-four hours be given by telephone. The North Dakota Statute authorizes physician's agents to give this information. § 14–02.1–02(5). Thus, the State argued that the statute would not require two trips to the clinic, but only a telephone call and one trip. Further, the opinion would allow the several physicians referred to in the Act, including the referring physician, to determine gestational age, and a physician's agent could give this information over the telephone. The State's interpretation of its statute in this proposed opinion would eliminate many of the arguments supporting the presence of an undue burden. Should this opinion not be issued, or should it be issued and later substantially restricted, different issues could well be presented, particularly in a subsequent as-applied challenge to the Act.

We vacate the temporary stay pending appeal. We have expedited the appeal and will hear argument on the merits on April 14, 1993.

McMILLIAN, Circuit Judge, concurring specially in vacating the stay.

I concur with the vacating of the stay pending appeal. However, I reserve my comments on the merits. The stay pending appeal is the only matter before the court at this time, and this opinion should not be read as a disposition on the merits.